DANIEL HEALY, Respondent, *v.* CARTER & WEEKES STEVEDORING COMPANY, Appellant.

First Department, May 29, 1925.

Ships and shipping — action by longshoreman to recover for injuries suffered while loading barreled apples in hold of ship — barrels were lowered by sling containing draft of nine barrels — negligence alleged was failure to use nets and absence of gangwayman — barrel of apples fell on plaintiff's leg — defendant furnished nets and extra gangwaymen — if use of sling was negligence, such negligence was act of fellow-employee — absence of gangwayman was negligence of fellow-employee — failure to use nets provided was negligence of fellow-employee — plaintiff assumed risk of accident.

The plaintiff, a longshoreman, who, while engaged in loading barrels of apples into the hold of a ship, was injured by a barrel which fell upon him, cannot recover for the injuries suffered on the theory that the defendant should have used nets in lowering the barrels into the hold instead of slings which carried a draft of nine barrels each, or on the theory that a gangwayman was absent from the gangway at the time the draft in question was lowered, for it appears that the defendant supplied nets for use in lowering merchandise into the hold of the vessel, and, therefore, if it was negligence to lower the draft of apples by a sling, that negligence was chargeable to a fellow-employee, and if the gangwayman was absent at the time the particular draft was lowered, it was the negligence of a fellow-employee, for it appears that the defendant furnished extra gangwaymen so that one would always be present in case of the temporary absence of the regular gangwayman.

The defendant was not chargeable with negligence for failure to provide nets which the plaintiff claims should have been used, for the evidence establishes that the defendant had a sufficient quantity of nets in its storeroom for use in loading and unloading ships.

The plaintiff assumed the risk of the accident, since it appears that he had been engaged in work as a longshoreman for nine years prior to the accident, had frequently loaded apples for the defendant and other companies, and knew that if a draft of apples struck the coaming while being lowered, some of the barrels would fall.

APPEAL by the defendant, Carter & Weekes Stevedoring Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 14th day of May, 1924, upon the verdict of a jury for $1,125, and also from an order entered in said clerk's office on the 21st day of May, 1924, denying defendant's motion for a new trial made upon the minutes.

*Jeremiah F. Connor,* for the appellant.

*Jeremiah A. O'Leary,* for the respondent.

MERRELL, J.:

The action was brought by the plaintiff, a longshoreman, to recover at common law damages which he alleges he sustained by reason of the negligence of the defendant. The defendant was a stevedoring company engaged in the business of loading and unloading vessels at the various piers about New York city. Plaintiff received personal injuries at an early morning hour on March 4, 1921, while engaged as an employee of the defendant as a longshoreman in loading a cargo of apples upon the steamship *Algeria* moored at pier 64 on the North river. The injuries which the plaintiff received resulted from a barrel, being a part of a draft that was being lowered into the hold of the steamship and which fell from the draft, striking the plaintiff's left leg and tearing the flesh and causing the injury to the plaintiff for which the plaintiff sought to recover in the action. In his complaint the plaintiff charges the defendant with negligence in several respects, which negligence the plaintiff alleges was the sole and proximate cause of the injuries which he sustained. The plaintiff therein alleges that his injuries were caused solely through the negligence of the defendant in operating or causing to be operated a hoisting apparatus which was unsafe and dangerous, in that the defendant operated the same without a sufficient number of employees, without sufficient apparatus and safety appliances to guide and direct said apparatus, and in negligently and carelessly moving and operating the same so as to cause the draft containing nine barrels of apples, which was suspended from the hoisting apparatus, to strike the plaintiff; in failing to have a signalman to direct the operation of said apparatus; in failing to have a tagline attached to said draft so as to guide and protect the same; in failing to have said draft properly bundled and tied together; in placing too many barrels within the draft; in failing to warn the plaintiff of the approach of the draft; and, generally, in failing to provide safe works, ways, machinery and plant in connection with said work then being carried on by the defendant. At the trial, however, the plaintiff confined his charges of negligence on the part of the defendant to two: *First,* that the defendant had failed to provide a net for the purpose of lowering the barrels of apples into the hold; and *second,* that it had failed to provide a signalman to warn the plaintiff of the lowering of the draft from which the barrel which struck plaintiff fell. After the close of the main charge of the court to the jury, counsel for the plaintiff stated: " I wish to consent to the request to charge on

the part of the defendant to the effect that there is no question of competency or incompetency of servants in this case. The plaintiff simply charges that the failure to provide this net, and the failure to provide a signalman, are the elements of negligence in the case." Thereupon the court charged the jury as follows: " I say to you now, gentlemen, there is no proof about the competency or incompetency of these men. If the defendant has performed all his duty in regard to proper appliances, and if an accident was caused by the negligence of a fellow servant, the plaintiff should not get your verdict." No objection was made nor exception taken to such charge.

The plaintiff, an unmarried man of the age of thirty-eight years at the time of the accident, had worked as a longshoreman for nine years, and on March 4, 1921, was in the employ of the defendant. On the day in question the plaintiff and his fellow-employees of the defendant were engaged in loading a cargo of apples upon the steamship *Algeria.* There were five hatches into which the apples, which were in wooden barrels, were being lowered. The plaintiff was employed at No. 4 hatch and was one of a gang of twenty men employed in that hatch, ten men being employed on the starboard and an equal number on the port side. The barrels of apples were taken from a lighter moored alongside the vessel in drafts of nine barrels each. These drafts were made up by laying down a sling, then placing four barrels side by side upon it, three barrels on top of the four, and two upon the three, forming a pyramid of nine barrels. The sling was then brought up and the ends brought together, a hook attached, and by means of a hoist and winch the draft of nine barrels was raised from the lighter, swung over the steamship, and lowered through the hatch into the hold. A foreman was present directing the action of the man operating the winch, and a gangwayman or a signalman at the hatch, whose duty it was to see that the drafts were not lowered until the stevedores beneath were away from the mouth of the hatch. The barrels were of ordinary size, about two and one-half or three feet in height, about twenty inches in diameter at the head, with a slightly greater diameter at the bilge or middle of the barrel, each barrel weighing about 200 pounds. The plaintiff testified that he had commenced work at about seven o'clock in the forenoon of the day previous and had worked continuously, aside from the time required for his meals, until about two o'clock in the morning of March fourth; that they had commenced loading apples around eleven o'clock of the night before he was hurt. The evidence shows that the hatch and hold were well lighted by electricity. The winch was operated by means of electricity. The

hatch was fifteen or eighteen feet square and was surrounded by an iron or metallic coaming. The plaintiff testified that just before he received his injuries he was at work storing away a barrel of apples on the starboard side; that in lowering the drafts, the gang on each side received an alternate draft, and that the draft from which the barrel fell that struck him was the draft intended for the gang on the port side. The plaintiff testified that he heard this draft strike the coaming; that he did not see it, but knew from the sound what had occurred; and that almost immediately the barrel fell, striking him on his left leg; that he did not feel pain at the time, although his overalls were torn and the wound, which was about two inches in length and torn, bled to some extent; that when the plaintiff was struck he was away from the hatch opening; that about ten or fifteen minutes transpired between the drafts that were lowered into the hold; that when he heard the noise he looked aloft but did not see the gangwayman or signalman there, but that he had seen him in his position ten minutes before, and that it was the duty of this gangwayman or signalman, as a draft came over the coaming and was about to be lowered, to call down for the stevedores to " look out below." The plaintiff testified that the method adopted by the defendant in lowering drafts of barreled apples was uniformly to use the sling which has been mentioned; and that while there were nets at hand which could have been used, they never were used for the purpose of lowering drafts of apples. The plaintiff further testified that the method in general use in the vicinity of the North river and along the North river front in loading apples was to use nets, but that the defendant never adopted that method; that at other piers they had nets and put the barrels into net slings. Plaintiff further testified that there was nothing to hold the barrels in the sling used by defendant's employees or to prevent their getting out in case the draft struck the coaming. Plaintiff also testified that he heard no warning at the time the draft in question was being lowered, and that it fell about three or four feet from where he was at work stowing away a barrel from the previous draft, with his back toward the hatch opening.

The plaintiff testified that ever since the accident happened and until the time of the trial the wound in his leg had never healed; that following the accident he was out of work about three or four months, and was treated by various surgeons and at hospitals, but without success in closing the wound. Plaintiff testified that the wound was not a deep one, but that the flesh was torn. He testified that the second day after he received his injuries his wound began to pain him; that he was able to work but a part

First Department, May, 1925.                    [Vol. 213

of the time each week, sometimes two days, and sometimes three; that prior to the accident he earned eight dollars and eighty cents a day of ten hours, and worked overtime receiving one dollar and twenty cents an hour for such overtime.

The medical testimony offered by the plaintiff was to the effect that he had a chronic indolent ulcer of the leg as the result of his injury, and that the same was very slow in healing. Surgical testimony was given by the plaintiff to the effect that his condition was permanent in that while the wound might heal, the tendency to break down at the slightest cause was evident, and that by using the limb and working the plaintiff would be apt to open the wound.

John Sullivan, called as a witness for the plaintiff, testified that he was a longshoreman and a member of the plaintiff's gang at the time the plaintiff received his injury. Sullivan testified that as they were at work he heard a crash on the coaming; that he was facing the draft and saw the draft strike the coaming, and that he at the time did not see the gangwayman overhead. Sullivan testified that a barrel came out of the draft and, falling, bounced and hit the plaintiff. He testified that there was nothing to hold the barrels sideways in the draft, and that as the draft was being lowered it would swing, and that the operation was done rapidly. Sullivan testified that he had been engaged as a longshoreman and as a stevedore for a number of years, and had been employed by different lines and had seen barrels containing merchandise lowered into ships' holds and taken out of ships, and had often seen drafts containing eight or nine barrels loaded and unloaded on and off ships; that there was in general use, on and prior to that day in that vicinity, a method of loading barrels, which was by the use of nets, which nets were about twelve feet square; and that when nets were used the barrels could not fall therefrom; that after the barrels had been placed in the nets there was a ring on each side through which a rope passed, and the two parts were hooked together and the rope bound around the edge keeping the same tight. Sullivan testified that he worked for the defendant three or four years, and that pier 64, North river, where the accident happened, was an Anchor Line pier. He testified that the defendant had nets there, but never used them prior to the accident, and that by the use of nets twelve or sixteen barrels of apples — never as a rule less than sixteen — were included in each draft where nets were used.

The plaintiff, aside from his medical evidence, swore no other witnesses in support of his claim. In its behalf the defendant called John Lancer, its superintendent. Lancer testified that at

the time of the accident in March, 1921, he was supervisor for pier 64, North river, in the employ of the defendant; that his duties were to look after the foremen and general loading and unloading of ships, getting them in trim and ready for sailing. Lancer testified that on the night in question there were six gangs of twenty-one or twenty-two men in each engaged in loading the *Algeria.* Part of these men were on deck, and part on the pier or over the side, wherever they had to work. All were longshoremen; that a gangwayman was provided for each gang, and two winchmen for each hatch, one for lifting and stowing over the side, and the other one for the boom over the hatch to transfer the drafts from over the side to the center of the hatch and lowering the same into the hold; that the winches and booms belonged to the ship; that the defendant had ropes and falls and all the gears, everything pertaining to discharging and loading a ship, except the booms and winches, which belonged to the ship; that a foreman was provided for each gang, and two extra gangwaymen were provided, whose services were utilized in case any one of the gangwaymen was compelled to temporarily absent himself from his duties. Lancer testified that the only way in which barrels of apples were loaded in ships in and prior to March, 1921, was by means of the sling which has been described; and that the custom was to sling nine barrels of apples in a draft; and that prior to March 4, 1921, nets were not used in lowering barrels into a ship. Lancer testified that he had been in the stevedoring business for over forty years, and had never seen apples loaded into a ship with the use of nets; that nets were used ordinarily for loading tubs of butter, cheese, barbed wire, and small, round packages, or anything of a shape that could not be lowered by means of the sling. On cross-examination Lancer testified that the operation of lowering the drafts could not be safely carried on without a gangwayman. He also testified that they had any amount of nets on the dock, but that he never gave orders to use them; that it was never necessary to use them with apples.

Michael Williams, called as a witness in behalf of the defendant, testified that he was a longshoreman in the employ of the defendant on March 4, 1921, and that he was a foreman on this job. The testimony of Williams did not vary materially from that of the defendant's witness Lancer as to the method adopted in lowering apples into the hold of a ship.

Joseph Smith, called as a witness by defendant, testified that he was in the employ of the defendant on March 4, 1921, and was foreman in charge of the ship in the absence of Lancer, under whom he was working. Smith testified that a storeroom was

First Department, May, 1925. [Vol. 213

provided on the pier where machinery, ropes and appliances were kept, and that therein was kept everything used upon the ship, including ropes, slings, chains, rollers and nets; but that the method in use in lowering apples into a ship on that occasion was by means of rope slings; that this witness had been engaged in loading apples for twenty years and had always used the rope sling method.

The medical testimony offered by the defendant contradicted to a great extent that offered by plaintiff. Defendant's surgical witnesses testified that the wound upon plaintiff's leg had healed, although a scar remained; and that the plaintiff was suffering alone from varicose veins.

It will thus be seen that the testimony presented sharp questions of fact, not alone as to the extent of plaintiff's injuries, but upon the question as to whether or not the method adopted by the defendant in lowering the drafts of apples was a reasonably safe one and one in general use for that purpose.

We are of the opinion that, assuming the truth of the testimony given in behalf of the plaintiff that the method adopted in lowering the drafts of apples was a negligent one, and that the method then in general use in the vicinity where the plaintiff received his injuries was to use nets for the purpose of lowering drafts into the holds of ships, nevertheless, the defendant cannot be held liable for the failure of its employes to adopt such method. We are of the opinion that under the testimony, if it was negligent to lower the draft of apples, from which the barrel fell which struck the plaintiff, in the manner adopted, such negligence was that of fellow-employees of the plaintiff and not the negligence of the defendant, which the evidence shows had provided the very means and appliances which the plaintiff complains were not used. All that the defendant was required to do was to furnish competent workmen and reasonably safe means and appliances to accomplish the work in hand. The record is replete with testimony that the defendant was negligent in neither of these respects. As to the employment of competent workmen, counsel for the plaintiff, after the close of the main charge of the court to the jury, consented that the court charge, in response to the defendant's request, that there was no question of competency or incompetency of servants in the case; and the court so instructed the jury. No evidence was given but what the defendant employed a sufficient number of competent workmen to perform the work upon which the plaintiff was engaged. The only charges of negligence were that the defendant failed to provide a signalman and failed to provide nets for use in lowering the drafts. As to the signalmen, the testimony of the plaintiff himself was that while he did not see

the signalman at the time the draft in question was lowered, he had seen him at his post ten minutes before. If the signalman which the defendant provided temporarily absented himself from his post, the defendant, having provided extra men to take his place, could not be charged with the negligence of plaintiff's fellow-workmen in failing to perform their assigned duties. As to plaintiff's chief complaint, that the defendant was negligent in failing to provide nets, an examination of the testimony discloses that there was no remissness on defendant's part in this respect. The plaintiff himself testified, when asked if he had ever seen the defendant use a net to lower barrels into the ship up to the time he was injured: " I do not know that they used them on apples, but they would use them on stuff that I could not put the sling on — they would not use them on apples. * * * They used nets all the time. * * * Q. They never used on these piers where Carter & Weekes were, where you did that work, they never used them? A. They have nets always there. * * * They did not use them on apples. I did not see them use them on apples, but they may have."

Plaintiff's witness Sullivan testified: " They had nets there, but I never seen them using them." Defendant's witness Lancer testified that nets were in use by the defendant in loading boxes of cheese, tubs of butter, barbed wire, and other round objects,. and that defendant had any amount of nets on the dock. Defendant's witness Smith testified that the defendant had a storeroom on the pier where they kept nets and other appliances for use in loading the ship.

From this testimony it will be seen that the defendant was not chargeable with negligence for failure to provide the nets which the plaintiff claimed should have been used; and under many decisions of the courts of this State the defendant performed its full duty in such respect by furnishing the necessary appliances; and if such appliances thus provided by the defendant were not used and the injury to the plaintiff was the result of the failure to use the means thus provided, the failure of duty was that of plaintiff's fellow-employees concerning a mere detail of the work for which plaintiff's co-employees were alone responsible. (*McConnell* v. *Morse I. W. & D. D. Co.*, 187 N. Y. 341; *Madigan* v. *Oceanic Steam Navigation Co.*, 178 id. 242; *Depirro* v. *Robins Co.*, 210 id. 93; *Vogel* v. *American Bridge Co.*, 180 id. 373; *Webber* v. *Piper*, 109 id. 496.) In several recent decisions this court has held that under like circumstances the master cannot be held liable, and that the negligence, if any, was the negligence of the plaintiff's fellow-employees, for which the master was not chargeable. (*Scano* v.

*Turner & Blanchard, Inc.,* 209 App. Div. 41, 47; *Pascale* v. *Carter & Weeks Stevedoring Co.,* Id. 813.)

We are also of the opinion that under the evidence in the case the plaintiff assumed the risk of the accident which befell him. Plaintiff testified that he had been employed as a longshoreman for nine years prior to the accident and had frequently loaded apples for the defendant and other companies; that for nine years, while working for the defendant, he had observed that the defendant always used the sling method in loading instead of the net. The plaintiff fully appreciated the dangers attending the operations as thus carried on by the defendant, and we think must be held to have assumed such dangers. (*Grady* v. *National Conduit & Cable Co.,* 153 App. Div. 401; *Vogel* v. *American Bridge Co.,* 180 N. Y. 373; *Kimmer* v. *Weber,* 151 id. 417; *Gombert* v. *McKay,* 201 id. 27.) The plaintiff testified that during his employment with the defendant for a long period of years he knew that barrels would fall from the slings if they struck the coaming of the hatch in lowering. Nevertheless, he continued to work as he had theretofore. There was no evidence that the plaintiff objected to the method adopted by the defendant, or that he ever requested that nets be used instead of slings in lowering the drafts. Under such circumstances we think the plaintiff must be deemed to have assumed the risks of his employment.

At the close of the plaintiff's case the defendant moved for a nonsuit for plaintiff's failure to prove facts sufficient to constitute a cause of action, and on the ground that the plaintiff had failed to show any negligence on the part of the defendant; that the risks of injury were open and obvious and assumed by the plaintiff, and also upon the ground that the negligence, if any, was that of a fellow-servant; and renewed such motion at the close of the evidence. The court denied such motion, and the defendant duly excepted thereto.

We think the court erred in thus refusing to grant defendant's motion, and that the judgment and order appealed from should be reversed, with costs, and plaintiff's complaint dismissed, with costs.

CLARKE, P. J., DOWLING, MCAVOY and BURR, JJ., concur.

Judgment and order reversed, with costs, and complaint dismissed, with costs.